UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ALABAMA
NORTHERN DIVISION

KAYO CLEVELAND,

     PLAINTIFF,

v.

EQUIFAX INFORMATION SERVICES,
LLC, TRANS UNION, LLC, LENDING
CLUB CORPORATION, PENTAGON
FEDERAL CREDIT UNION, REGIONS
BANK, ALPHA RECOVERY
CORPORATION AND FULL CIRCLE
FINANCIAL SERVICES, LLC,

     DEFENDANTS.

Civil Case No. 2:20-CV-00052

***JURY TRIAL DEMANDED***

## COMPLAINT

Plaintiff Kayo Cleveland ("Plaintiff"), by and through the undersigned counsel, and with knowledge as to Plaintiff's own acts, upon information, belief, and investigation of counsel as to the acts of others, believing such allegations have evidentiary support after a reasonable opportunity for further investigation or discovery alleges against Defendants[1] as follows:

## PRELIMINARY STATEMENT

1.    This is an action for an actual, statutory and punitive damages, costs and attorneys' fees pursuant to 15 U.S.C. §§ 1681, *et seq*., Fair Credit Reporting Act ("FCRA"), Fair Debt Collection Practices Act 15 U.S.C. § 1692, *et seq*. ("FDCPA") and 47 U.S.C. § 227, the Telephone Consumer Protection Act ("TCPA").

2.    Indeed,

Credit is the lifeblood of the modern American economy, and for the American consumer access to credit has become inextricably tied to consumer credit scores

---

[1] Defendants Equifax Information Services, LLC and Trans Union, LLC are referred to collectively as the "CRA Defendants".

as reported by credit reporting agencies. In 1970, the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* ("FCRA") was enacted "to ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy." *Safeco Ins. Co. v. Burr*, 551 U.S. 47, 52 (2007). Towards that end, the FCRA requires a company that reports consumer credit information, referred to as a consumer reporting agency ("CRA"), to "adopt reasonable procedures for meeting the needs of commerce" which are "fair and equitable to the consumer." 15 U.S.C. § 1681(b).

*Burke v. Experian Info. Sols., Inc.*, No. 1:10-CV-1064 AJT/TRJ, 2011 WL 1085874, at *1 (E.D. Va. Mar. 18, 2011).

3.    Accordingly, and

In recognition of the critical role that CRAs play in the credit markets and the serious consequences borne by consumers because of inaccurate information disseminated in consumer credit reports prepared by CRAs, Congress placed on a CRA what can only be described as very high legal duties of care, set forth, as they apply to this case, in 15 U.S.C. §§ 1681e(b), 1681i(a)(1)(A), and 1681i(a)(3)(A).

*Burke v. Experian Info. Sols., Inc*., No. 1:10-CV-1064 AJT/TRJ, 2011 WL 1085874, at *4 (E.D. Va. Mar. 18, 2011).

4.    Congress made the following findings when it enacted the FCRA:

(1) The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

(2) An elaborate mechanism has been developed for investigating and evaluating the credit worthiness, credit standing, credit capacity, character, and general reputation of consumers.

(3) Consumer reporting agencies have assumed a vital role in assembling and evaluating consumer credit and other information on consumers.

(4) There is a need to insure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy.

15 U.S.C. § 1681(a)(1-4).  Thus, one of the fundamental purposes of the FCRA is "to require that

consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for

consumer credit, personnel, insurance, and other information in a manner which is fair and

equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper

utilization of such information in accordance with the requirements of this subchapter." 15 U.S.C. § 1681(b). Accordingly, "[t]he FCRA evinces Congress' intent that consumer reporting agencies, having the opportunity to reap profits through the collection and dissemination of credit information, bear 'grave responsibilities.'" *Cushman v. Trans Union*, 115 F.3d 220, 225 (3d Cir. 1997).

5. The disclosure of consumers' credit files to third parties is recorded by the CRA Defendants as a request for the consumer's credit history or personal identifying information, or both.

6. Inquiries are items of information contained in a consumer's "file," as that term is defined by 15 U.S.C. § 1681(a)(g).

7. Equifax records and retains inquiries in consumers' files.

8. Trans Union records and retains inquiries in consumers' files.

9. Creditors and debt collectors often "skip trace" debtors by requesting consumer information from the CRA Defendants.

10. "Evidence that a defendant has repeatedly engaged in prohibited conduct while knowing or suspecting that it was unlawful would provide relevant support for an argument that strong medicine is required to cure the defendant's disrespect for the law." *Dalton v. CAI*, 257 F.3d 409, 418 (4th Cir. 2001) (noting that whether "other consumers have lodged complaints similar to Dalton's against CAI" is relevant to willfulness under the FCRA).

11. The CRA Defendants have been sued thousands of times wherein an allegation was made that said defendants violated the FCRA. Moreover, said defendants are sued hundreds of times per year wherein an allegation is made that said defendants prepared consumer reports with items of information included in the plaintiff's file due to identity theft.

12.     In the regular course of business, Equifax and Trans Union maintain records of lawsuits filed against them, and the lists of other similar incidents are readily accessible to said defendants.

13.     Equifax has produced such a list of other similar incidents to the undersigned.

14.     Equifax has been ordered in single plaintiff FCRA lawsuits to produce discovery responses on the number of times it has been sued.

15.     Trans Union has been ordered in single plaintiff FCRA lawsuits to produce discovery responses on the number of times it has been sued.

16.     Upon information and belief, the non-CRA Defendants are regularly sued in state and federal court wherein a consumer has alleged violations of consumer protection statutes, such as the FCRA, FDCPA or TCPA.

17.     The FDCPA is another consumer protection statute designed to protect consumers, especially identity theft victims, from unscrupulous debt collectors.

18.     The TCPA is a federal statute that broadly regulates the use of automated telephone equipment.

19.     Among other things, the TCPA prohibits certain unsolicited marketing calls, restricts the use of automatic dialers or prerecorded messages, and delegates rulemaking authority to the Federal Communications Commission ("FCC").

20.     The TCPA is a consumer protection statute that also protects identity theft victims from unwanted "robo" calls related to fraudulent debts.

21.     The sale of consumers' most private and sensitive personal and financial information is a multi-billion-dollar industry for the CRAs.

22.     Equifax Information Services, LLC reported more than $3.4 billion in operating revenue in its annual report for year ending in 2018.[2]

23.     Trans Union LLC reported over $2.3 billion in revenue in 2018.[3]

24.     LendingClub Corporation reported over $690 million in revenue in 2018.[4]

25.     Pentagon Federal Credit Union reported over $156 million in 2018.[5]

26.     Regions Bank reported over $1.56 billion in revenue in 2018.[6]

## JURISDICTION AND VENUE

27.     This Court has jurisdiction pursuant to 15 U.S.C. §§ 1681p, 1692k(d), 47 U.S.C. § 227 and 28 U.S.C § 1331.

28.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b).

## PARTIES

29.     Plaintiff Kayo Cleveland ("Plaintiff" or "Mrs. Cleveland") is an adult individual and residing at 201 Kent Street, Selma, Alabama 36701.  Plaintiff is a "consumer" as defined by 15 U.S.C. §§ 1681a(c) and 1692a(3).

---

[2] https://investor.equifax.com/~/media/Files/E/Equifax-IR/Annual%20Reports/2018-annual-report.pdf Last visited January 30, 2020.

[3] https://investors.transunion.com/~/media/Files/T/Transunion-IR/annual-reports/2018/annual-report-2018.pdf Last visited January 30, 2020.

[4]  https://ir.lendingclub.com/QuarterlyResults#Collapse4 Last visited January 30, 2020.

[5]  https://www.penfed.org/content/dam/penfed/general/pdf/general-pdfs/2018_PenFed_AnnualReport.pdf Last visited January 30, 2020.

[6] https://ir.regions.com/~/media/Files/R/Regions-IR/documents/annual-reports/Annual%20Review/Regions-2018-Annual-Review.pdf Last visited January 30, 2020.

30.     Defendant Equifax Information Services, LLC ("Equifax") does business in this judicial district and is a Georgia corporation with its principal place of business located at 1550 Peachtree Street NE, Atlanta, Georgia 30309.  Equifax is a CRA as defined by 15 U.S.C. § 1681a(f).  Equifax regularly engages in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing "consumer reports" as defined by 15 U.S.C. § 1681a(f) to third parties.  Equifax disburses such consumer reports to third parties of contract for monetary compensation.  Equifax outsources business processes, including consumer disputes to other countries, such as Mumbai, India. One of Equifax's dispute vendors is Intelenet. Equifax also outsources business processing services (e.g., consumer requests and disputes) to companies in the Philippines and Costa Rica.

31.     Defendant Trans Union LLC ("Trans Union") does business in this judicial district and is a Delaware corporation with its principal place of business located at 555 W Adams Street, Chicago, Illinois 60661. Trans Union does business in this judicial district.  Trans Union is a CRA as defined by 15 U.S.C. § 1681a(f).  Trans Union regularly engages in the business of assembling, evaluating and disbursing information concerning consumers for the purpose of furnishing "consumer reports" as defined by 15 U.S.C. § 1681a(f) to third parties.  Trans Union disburses such consumer reports to third parties of contract for monetary compensation. Trans Union outsources business processes, (e.g., consumer requests and disputes), such as India.  One of Trans Union's dispute vendors is Intelenet.

32.     Defendant Alpha Recovery Corporation ("Alpha") is a foreign corporation with its principal place of business located at 6912 South Quentin Street #10, Centennial, Colorado 80112. Alpha is engaged in the business of a collection agency, using the mail and telephone to collect consumer debts originally owed to others.  Alpha's principal purpose is debt collection, and it is a

debt collector as defined by 15 U.S.C. § 1692a(6) of the FDCPA. is also a debt collector as contemplated by the FDCPA.

33.     Defendant Full Circle Financial Services, LLC ("FCF") is a foreign limited liability company with its principal place of business located at 12425 Race Track Road, Suite 100, Tampa, Florida 33626.  FCF is engaged in the business of a collection agency, using the mail and telephone to collect consumer debts originally owed to others.  FCF's principal purpose is debt collection, and it is a debt collector as defined by 15 U.S.C. § 1692a(6) of the FDCPA. FCF is also a debt collector as contemplated by the FDCPA.

34.     Defendant LendingClub Corporation ("LendingClub") is a person who furnishes information to consumer reporting agencies under FCRA, 15 U.S.C. § 1681s-2[7], and conducts substantial and regular business activities in this judicial district. LendingClub is a foreign corporation with its principal place of business located at 595 Market Street, Suite 200, San Francisco, California 94105.

35.     Defendant Pentagon Federal Credit Union ("PenFed") is a person who furnishes information to consumer reporting agencies under FCRA, 15 U.S.C. § 1681s-2[8], and conducts substantial and regular business activities in this judicial district.   Pentagon Federal Credit Union is a national credit union with its principal place of business located at 7940 Jones Branch Drive, Tysons, Virginia 22102.

---

[7] Plaintiff is making a claim against LendingClub under § 1681s-2(b).  Plaintiff is not making a claim against said defendant under § 1681s-2(a).

[8] Plaintiff is making a claim against PenFed under § 1681s-2(b).  Plaintiff is not making a claim against said defendant under § 1681s-2(a).

36.     Defendant Regions Bank ("Regions") is a person who furnishes information to consumer reporting agencies under FCRA, 15 U.S.C. § 1681s-2[9], and conducts substantial and regular business activities in this judicial district.   Regions Bank is a domestic corporation with its principal place of business located at 641 South Lawrence Street, Montgomery, Alabama 36104.

37.     At all times relevant hereto, the defendants acted through its agents, employees, officers, members, directors, heirs, successors, assigns, principals, trustees, sureties, subrogees, representatives, and insurers.

## FACTUAL ALLEGATIONS

38.     Plaintiff is a victim of identity theft.

39.     In or around 2016, an impostor applied for and opened accounts with several creditors, including LendingClub, PenFed and Regions.

40.     Some of the personal identifying information used in connection with the applications for credit purportedly concerned Plaintiff.

41.     Plaintiff did not apply for or authorize someone on their behalf to apply for credit with LendingClub, PenFed and Regions, *inter alia*.

42.      Plaintiff did not receive any goods, benefits or services from LendingClub, PenFed or Regions, in connection with the fraudulent accounts.

43.     Plaintiff discovered the fraud in or around April 2018, after PenFed began dunning her for a past due PenFed account.

---

[9] Plaintiff is making a claim against Regions under § 1681s-2(b).  Plaintiff is not making a claim against said defendant under § 1681s-2(a).

44.    Mrs. Cleveland immediately began the arduous task of clearing her good name with each of the creditors[10] who extended credit in Plaintiff's name to the impostor.

45.    On April 23, 2018, Plaintiff reported the theft of her identity to the Selma Police Department.

46.    On April 30, 2018, Plaintiff completed and submitted an Identity Theft Report to the Federal Trade Commission ("FTC").

47.    On May 3, 2018, Plaintiff disputed the fraudulent PenFed account, by fax, to PenFed.  In support of her dispute, Mrs. Cleveland included copies of the FTC Identity Theft Report, identity theft report prepared by the Selma Police Department, her driver's license and vehicle registration.  Mrs. Cleveland also included a copy of 15 U.S.C. § 1681g(e) and requested PenFed to send her the underlying account documents related to the account, including:

a.   account applications made on paper, online or by telephone;

b.   account statements and invoices;

c.   records of payments/charge slips;

d.   signatures on applications and accounts;

e.   investigator's report and summary;

f.   delivery address associated with the account;

g.   all records of phone numbers used to activate or access the account;

h.   application records or screen prints of internet/phone applications; and,

i.   any other documents associated with the account.

48.    Mrs. Cleveland hand signed her May 3, 2018 request.

---

[10] Several other creditors opened accounts for the impostor during the same time period; however, after receipt of Plaintiff's disputes, those accounts were quickly closed, and the creditors did not attempt to collect from Plaintiff.

49.     On May 10, 2018, Mrs. Cleveland faxed PenFed again, and supplied PenFed a second request for the underlying PenFed account documents.

50.     On or around July 31, 2018, PenFed generated prepared documents in response to Plaintiff's May 3, 2010 request.   The documents included: (1) loan payment instructions to PenFed; (2) Truth in Lending ("TILA") Disclosure; (3) Security Agreement; (4) Plaintiff's April 30, 2018 dispute letter and FTC Identity Theft Report that PenFed presumably received from the FTC.

51.     All of the documents described in the preceding paragraph included wet signatures.

52.     PenFed did not provide Plaintiff with account applications made on paper, online or by telephone; account statements and invoices; records of payments/charge slips; investigator's report and summary; delivery address associated with the account; all records of phone numbers used to activate or access the account; or, any other documents associated with the account, such as the identifying documents considered by PenFed when the account was opened by the impostor.

53.     PenFed continued to call Plaintiff's cell phone in an attempt to collect on the account.

54.     PenFed's collection attempts continued to escalate.  On August 23, 2018, A. Piazza from the "Delinquency Control Center" in Scranton, Pennsylvania penned a letter to Mrs. Cleveland stating the original $3,636.08 loan was now past due in the amount of $4,329.60, and if she did not pay the account in full PenFed would credit report the account as a "charge-off." PenFed also threatened to turn over the account to an attorney or collection agency in her community, which she then would be responsible for the payoff, plus 25% of the balance for collection expenses and attorneys' fees.

55.     PenFed continued to call Plaintiff's cell phone in an attempt to collect on the account through at least October 2018.

56.     On November 29, 2018, PenFed made good on its threat and reported the account to the consumer reporting agencies as a charge-off and sold the fraudulent debt to Axiom Acquisitions Ventures, LLC.

57.      Beginning in January 2019, Alpha began to attempt to collect on the former PenFed account.

58.     Alpha made numerous phone calls to Plaintiff's cell phone in an attempt to collect the debt.

59.     Alpha also sent Plaintiff dunning correspondence in an attempt to collect the debt.

60.     Like PenFed, LendingClub dunned Plaintiff for a fraudulent loan that was opened by an impostor.

61.     Plaintiff disputed the account directly to LendingClub, requested underlying account documents and demanded LendingClub cease calling her cell phone.

62.     FCF attempted to collect on the fraudulent debt from Plaintiff.  In connection with its collection efforts, FCF called Plaintiff's cell phone.  FCF did not have Plaintiff's consent to call her cell phone.

63.     PenFed credit reported false information in connection with at least one of the fraudulent accounts.

64.     LendingClub credit reported false information in connection with at least one of the fraudulent accounts.

65.     Regions credit reported false information in connection with at least one of the fraudulent accounts.

66.     Thereafter, the CRA Defendants included inaccurate items of information related to the fraudulent accounts in Plaintiff's file.

67.     The inaccurate information includes but is not limited to, accounts, personal identifying information and inquiries (hereinafter referred to as the "inaccurate information").

68.     The inaccurate information harms Plaintiff's credit reputation because it does not accurately depict Plaintiff's credit history or creditworthiness, or both.

69.     More specifically, the PenFed account was reported with delinquent history, including a balance of $3,636, 180 days or more past due, and with the worst possible credit rating, "charge off."

70.     The Lending Club account was reported with delinquent history, including a balance of $4,912, and with the worst possible credit rating, "charge off."

71.      The Regions' account opened by an impostor was reported with delinquent history, including a balance of $18,010, over 150 days past due, and with the worst possible credit rating, "charge off."

72.     Equifax prepared and issued consumer reports concerning Plaintiff to third parties that included the inaccurate information.   Equifax sold Plaintiff's credit report or consumer information, or both, to third parties for transactions that did not relate to Plaintiff.   Plaintiff disputed inaccurate information to Equifax.

73.     Plaintiff disputed the LendingClub account to Equifax, in writing, no less than four times.

74.     Likewise, Plaintiff disputed the PenFed account to Equifax, in writing, no less than four times.

75.     Similarly, Plaintiff disputed the Regions account to Equifax, in writing, no less than two times.

76.     Equifax did not delete or reinvestigate all of the disputed items of information.

77.     Alternatively, Equifax failed to consider all relevant information and perform a reasonable reinvestigation of the disputed items of information.

78.     Plaintiff provided Equifax with an identity theft report in support of Plaintiff's dispute of the inaccurate information no less than three times.  Equifax failed to block the disputed items of information after receipt of an identity theft report.

79.     Plaintiff disputed the address 338 Front Street, Anniston, Alabama due to fraud to Equifax no less than twice.  Both times, Equifax responded to Plaintiff that it deleted the address from her file; however, Equifax continues to report the fraudulent address in Plainiff's file.

80.     Trans Union sold Plaintiff's credit report or consumer information, or both, to third parties for transactions that did not relate to Plaintiff.

81.     Plaintiff disputed inaccurate information to Trans Union. In response to Plaintiff's first two written disputes to Trans Union, Trans Union did not delete or reinvestigate all of the disputed items of information.  Alternatively, Trans Union failed to consider all relevant information and perform a reasonable reinvestigation of the disputed items of information.

82.     Plaintiff requested Trans Union to provide Plaintiff with the steps it undertook while reinvestigating Plaintiff's dispute.  On at least one occasion, Trans Union failed to provide Plaintiff with the steps it undertook while reinvestigating the disputed items of information.

83.     Plaintiff requested Trans Union to provide Plaintiff with Plaintiff's file due to fraud and supplied Trans Union with a copy of an identity theft report.  On at least one occasion, Trans Union failed to provide Plaintiff with Plaintiff's file in response to Plaintiff's request.

84.     Plaintiff provided Trans Union with an identity theft report in support of Plaintiff's dispute of the inaccurate information.  Trans Union failed to block all of the inaccurate information after receipt of an identity theft report.

85.     In response to Plaintiff's disputes, the CRA Defendants did not contact third parties concerning the accuracy of the disputed information.

86.     The CRA Defendants also did not review underlying account documents for each account contained in Plaintiff's file or the subject of Plaintiff's disputes, or both, such as the applications for credit and the personal identifying information reported with each trade line.

87.     The CRA Defendants did not conduct any handwriting analysis on Plaintiff's signature or the signatures on the account applications or other underlying account documents.

88.     The CRA Defendants did not make a reasonable inquiry into the disputed information.

89.     The CRA Defendants did not review all relevant information provided by Plaintiff related to the disputed information.

90.     Upon information and belief, other than Equifax and Experian, Trans Union did not notify any third parties of Plaintiff's disputes or supply those persons with copies or images of Plaintiff's disputes and supporting documents.

91.     At best, the CRA Defendants verified the false information by confirming some of Plaintiff's personal identifying information with some of the personal identifying information reported by the data furnishers who supplied the disputed information.

92.     The CRA Defendants failed to modify or delete all of the inaccurate information.

93.     Despite Plaintiff's exhaustive efforts to date, the CRA Defendants have nonetheless deliberately, willfully, intentionally, recklessly and negligently repeatedly failed to perform reasonable reinvestigations of the above disputes as required by the FCRA.

94.     Plaintiff disputed the inaccurate information directly to LendingClub.

95.     Upon information and belief, LendingClub failed to report the account with the appropriate account in dispute code to the CRAs.

96.     Plaintiff disputed the inaccurate information to Equifax, Experian[11], and Trans Union.

97.     Equifax, Experian, or Trans Union notified LendingClub of the disputed information.

98.      LendingClub notified Equifax, Experian, or Trans Union that it verified the disputed information.

99.      As a part of LendingClub's FCRA investigation, it did not:

    a.   contact Plaintiff concerning the accuracy of the disputed information;

    b.   contact third parties, including but not limited to law enforcement, concerning the accuracy of the disputed information;

    c.   review underlying account documents, such as any applications for credit;

    d.   conduct any handwriting analysis on Plaintiff's signature or the signatures associated with the account, and in its own records;

---

[11] Experian, another nationwide consumer reporting agency, deleted inaccurate information from Plaintiff's file, including the accounts with LendingClub, PenFed and Regions on or around September 28, 2018.  Upon information and belief, Experian notified Equifax, LendingClub, PenFed, Regions and Trans Union of the deletion or fraud block of the items of information.

      e.  make a reasonable inquiry into the disputed information, including a review of the police report supplied by Plaintiff to the consumer reporting agencies;

      f.  review all relevant information provided by a consumer reporting agency pertaining to the disputed information;

      g.  delete the false account information; or,

      h.  mark or identify the account as in dispute.

100. At best, LendingClub verified the false information by confirming some of Plaintiff's personal identifying information related to the account with some of the personal identifying information reported by a consumer reporting agency.

101. LendingClub notified at least one consumer reporting agency that its reporting of the inaccurate information was accurate.

102. Upon information and belief, LendingClub notified at least one consumer reporting agency that its reporting of the disputed information was accurate after receipt of a block notification from a consumer reporting agency.

103.  LendingClub did not conduct a reasonable investigation with respect to the disputed information.

104. Plaintiff disputed the inaccurate information directly to PenFed.

105. PenFed failed to report the account with the appropriate account in dispute code to the CRAs.

106. Plaintiff disputed the PenFed account to Equifax, Experian, or Trans Union.

107. Equifax, Experian, or Trans Union notified PenFed of the disputed information.

108. PenFed notified Equifax, Experian, or Trans Union that it verified the disputed information.

109.    As a part of 's FCRA investigation, it did not:

    a.  contact Plaintiff concerning the accuracy of the disputed information;

    b.  contact third parties, including but not limited law enforcement, concerning the accuracy of the disputed information;

    c.  review underlying account documents, such as any applications for credit;

    d.  conduct any handwriting analysis on Plaintiff's signature or the signatures associated with the account, and in its own records;

    e.  make a reasonable inquiry into the disputed information, including a review of the police report supplied by the consumer reporting agencies;

    f.  review all relevant information provided by a consumer reporting agency pertaining to the disputed information;

    g.  modify or delete the false account information; or,

    h.  mark or identify the account as in dispute.

110.    At best, PenFed verified the false information by confirming some of Plaintiff's personal identifying information related to the account with some of the personal identifying information reported by a consumer reporting agency.

111.    PenFed notified at least one consumer reporting agency that its reporting of the inaccurate information was accurate.

112.    PenFed notified at least one consumer reporting agency that its reporting of the disputed information was accurate after receipt of a block notification from a consumer reporting agency.

113.    PenFed did not conduct a reasonable investigation with respect to the disputed information.

114.    Plaintiff disputed inaccurate information directly to Regions.

115.    Regions failed to report the account with the appropriate account in dispute code to the CRAs.

116.    Plaintiff disputed the Regions account to Equifax, Experian, or Trans Union.

117.    Equifax, Experian, or Trans Union notified Regions of the disputed information.

118.    Regions notified Equifax, Experian or Trans Union that it verified the disputed information.

119.    As a part of Regions's FCRA investigation, it did not:

  a.  contact Plaintiff concerning the accuracy of the disputed information;

  b.  contact third parties, including but not limited law enforcement, concerning the accuracy of the disputed information;

  c.  review underlying account documents, such as any applications for credit;

  d.  conduct any handwriting analysis on Plaintiff's signature or the signatures associated with the account, and in its own records;

  e.  make a reasonable inquiry into the disputed information, including a review of the police report supplied by the consumer reporting agencies;

  f.  review all relevant information provided by a consumer reporting agency pertaining to the disputed information;

  g.  modify or delete the false account information; or

  h.  mark or identify the account as in dispute.

120.    At best, Regions verified the false information by confirming some of Plaintiff's personal identifying information related to the account with some of the personal identifying information reported by a consumer reporting agency.

121.    Regions notified at least one consumer reporting agency that its reporting of the inaccurate information was accurate.

122.    Regions notified at least one consumer reporting agency that its reporting of the inaccurate information reported was accurate after receipt of a block notification from a consumer reporting agency.

123.    Regions did not conduct a reasonable investigation with respect to the disputed information.

**TCPA Allegations - PenFed**

124.    PenFed began placing calls to Plaintiff's cellular number ending in 7822 in an attempt to collect an alleged debt.

125.    The calls placed by PenFed mainly originated from (800) 451-7269 and (703) 838-1000.

126.    Upon information and belief, the phone numbers above are owned, operated or controlled by PenFed or its agent(s).

127.    Plaintiff received a phone calls from PenFed on her cell phone number ending in 7822; Plaintiff heard a short pause before one of PenFed's agents began to speak, indicating the use of an automated telephone dialing system.

128.    Plaintiff spoke to a representative, who indicated that PenFed was attempting to collect a debt.

129.    Plaintiff stated that she did not want PenFed to call her anymore.

130.    Plaintiff's request was ignored as Plaintiff continued to receive phone calls from PenFed on her cell phone.

131.    Between April 18, 2018[12], and October 5, 2018, PenFed called Plaintiff's cellular phone approximately 13 times.

132.    Between April 18, 2018 and October 5, 2018, PenFed called Plaintiff's cellular phone after requesting not to be called.

133.    Plaintiff also received numerous voicemail messages on her cell phone from PenFed.

134.    Defendant PenFed's calls invaded Plaintiff's privacy because the phone calls were excessive and persisted even after a request for them to cease.

135.    PenFed's calls were done with the purpose of attempting to harass Plaintiff into making a payment on the account.

136.    The conduct was not only oppressive, wanton, malicious, and willful, but was done with the intention of causing Plaintiff such distress, so as to induce her to pay the debt.

137.    PenFed would call Plaintiff many times within short periods of time.

138.    Further, the conduct was done with such frequency so as to annoy, harass, oppress, and/or abuse Plaintiff.

139.    PenFed's consistent bombardment of calls to Plaintiff's cell phone have caused her extreme stress, anxiety, nervousness, headaches, sleepless nights, and constant worry.

140.    PenFed's calls were done with a conscious disregard of Plaintiff's rights or safety.

141.    Defendant's automated debt collection calls have made Plaintiff's days unbearable because of the constant ringing of both her cell phone and home phone.

## **TCPA Allegations – Lending Club**

---

[12] Upon information and belief, PenFed called Plaintiff using an ATDS prior to April 2018 without Plaintiff's consent.

142.     LendingClub placed calls to Plaintiff's cellular number ending in 7822 in an attempt to collect an alleged debt.

143.     The calls placed by LendingClub mainly originated from (415) 632-5624 and (415) 632-4049.

144.     Upon information and belief, the phone numbers above are owned, operated or controlled by LendingClub or its agent(s).

145.     Plaintiff received phone calls from LendingClub on her cell phone number ending in 7822; Plaintiff heard a short pause before one of LendingClub's agents began to speak, indicating the use of an automated telephone dialing system.

146.     Plaintiff stated that she did not want LendingClub to call her anymore.

147.     This request was ignored as Plaintiff continued to receive phone calls from LendingClub on her cell phone.

148.     Between September 20, 2018, and February 5, 2019, LendingClub called Plaintiff's cellular phone no less than eight times.

149.     Between September 20, 2018, and February 5, 2019, LendingClub called Plaintiff's cellular phone after requesting not to be called.

150.     Plaintiff also received numerous voicemail messages on her cell phone from LendingClub.

151.     Defendant LendingClub's calls invaded Plaintiff's privacy because the phone calls were excessive and persisted even after a request for them to cease.

152.     LendingClub's calls were done with the purpose of attempting to harass Plaintiff into making a payment on the account.

153.   The conduct was not only oppressive, wanton, malicious, and willful, but was done with the intention of causing Plaintiff such distress, so as to induce her to pay the debt.

154.   LendingClub would call Plaintiff many times within short periods of time.

155.   Further, the conduct was done with such frequency so as to annoy, harass, oppress, and/or abuse Plaintiff.

156.   LendingClub's consistent bombardment of calls to Plaintiff's cell phone have caused her extreme stress, anxiety, nervousness, headaches, sleepless nights, and constant worry.

157.   LendingClub's calls were done with a conscious disregard of Plaintiff's rights or safety.

## TCPA Allegations - Alpha

158.   Alpha placed calls to Plaintiff's cellular number ending in 7822 in an attempt to collect an alleged debt.

159.   The calls placed by Alpha mainly originated from (415) 418-7943 and (415) 418-7957.

160.   Upon information and belief, the phone numbers above are owned, operated or controlled by Alpha or its agent(s).

161.   Plaintiff received phone calls from Alpha on her cell phone number ending in 7822; Plaintiff heard a short pause before one of Alpha's agents began to speak, indicating the use of an automated telephone dialing system.

162.   Plaintiff spoke to a representative, who indicated that Alpha was attempting to collect a debt.

163.   Plaintiff stated that she did not want Alpha to call her anymore.

164.    This request was ignored as Plaintiff continued to receive phone calls from Alpha on her cell phone.

165.    Between January 8, 2019, and January 30, 2019, Alpha called Plaintiff's cellular phone approximately five times.

166.    Between January 8, 2019, and January 30, 2019, Alpha called Plaintiff's cellular phone after requesting not to be called.

167.    Plaintiff also received numerous voicemail messages on her cell phone from Alpha.

168.    Defendant Alpha's calls invaded Plaintiff's privacy because the phone calls were excessive and persisted even after a request for them to cease.

169.    Alpha's calls were done with the purpose of attempting to harass Plaintiff into making a payment on the debt.

170.    The conduct was not only oppressive, wanton, malicious, and willful, but was done with the intention of causing Plaintiff such distress, so as to induce her to pay the debt.

171.    Alpha would call Plaintiff many times within short periods of time.

172.    Further, the conduct was done with such frequency so as to annoy, harass, oppress, and/or abuse Plaintiff.

173.    Alpha's consistent bombardment of calls to Plaintiff's cell phone have caused her extreme stress, anxiety, nervousness, headaches, sleepless nights, and constant worry.

174.    Alpha Recovery's calls were done with a conscious disregard of Plaintiff's rights or safety.

### TCPA Allegations - FCF

175.    FCF began placing calls to Plaintiff's cellular number ending in 7822 in an attempt to collect an alleged debt.

176.    The calls placed by FCF mainly originated from (727) 724-4200 and (855) 395-0141.

177.    Upon information and belief, the phone numbers above are owned, operated or controlled by FCF or its agent(s).

178.    Plaintiff received phone calls from FCF on her cell phone number ending in 7822; Plaintiff heard a short pause before one of FCF's agents began to speak, indicating the use of an automated telephone dialing system.

179.    Plaintiff spoke to a representative, who indicated that FCF was attempting to collect a debt.

180.    Plaintiff stated that she did not want FCF to call her anymore.

181.    This request was ignored as Plaintiff continued to receive phone calls from FCF on her cell phone.

182.    Between December 12, 2018, and January 18, 2019, FCF called Plaintiff's cellular phone approximately eight times.

183.    Between December 12, 2018, and January 18, 2019, FCF called Plaintiff's cellular phone after requesting not to be called.

184.    Plaintiff also received numerous voicemail messages on her cell phone from FCF.

185.    Defendant FCF's calls invaded Plaintiff's privacy because the phone calls were excessive and persisted even after a request for them to cease.

186.    FCF's calls were done with the purpose of attempting to harass Plaintiff into making a payment on the account.

187.    The conduct was not only oppressive, wanton, malicious, and willful, but was done with the intention of causing Plaintiff such distress, so as to induce her to pay the debt.

188.    FCF would call Plaintiff many times within short periods of time.

189.    Further, the conduct was done with such frequency so as to annoy, harass, oppress, and/or abuse Plaintiff.

190.    FCF's consistent bombardment of calls to Plaintiff's cell phone have caused her extreme stress, anxiety, nervousness, headaches, sleepless nights, and constant worry.

191.    FCF's calls were done with a conscious disregard of Plaintiff's rights or safety.

### FDCPA Allegations – Alpha

192.    Alpha is engaged in the business of a collection agency, using mail and telephone to collect consumer debts originally owed to others.

193.    Alpha's principal purpose is debt collection, and it is a debt collector as defined by 15 U.S.C. § 1692a(6) of the FDCPA.

194.    During the course of its efforts to collect debts allegedly owed to third parties, Alpha sends to alleged debtors bills, statements, and/or other correspondence via the mail and/or electronic mail and initiates contact with alleged debtors via various means telecommunication, such as the telephone and facsimile.

195.    According to Alpha, Plaintiff incurred an alleged debt for goods and services used for personal purposes, originally for a debt allegedly owed to Axiom an Alpha account number ending in 7526.

196.    The alleged debt is a debt as defined by 15 U.S.C. § 1692a(5) of the FDCPA.

197.    The alleged debt became past due and with a purported balance of $3,601.08.

198.    The alleged debt does not belong to Plaintiff.

199.    Alpha knew or should have known that the alleged debt did not belong to Plaintiff.

200.    Alpha received notice that Plaintiff challenged the validity and ownership of

the alleged debt.

201.    Notwithstanding, Alpha continued efforts to collect the alleged debt from Plaintiff.

202.    Alpha sent Plaintiff dunning letters concerning the alleged debt and represented to her that she owed Alpha or Axiom, or both, $3,601.08.

203.    Alpha contacted Plaintiff's mother and husband in connection with its collection efforts on the alleged debt.

204.    Plaintiff does not owe Alpha any monies as she did not open the underlying account with Axiom, or the original creditor, PenFed.

**FDCPA Allegations – FCF**

205.    FCF is engaged in the business of a collection agency, using mail and telephone to collect consumer debts originally owed to others.

206.    FCF's principal purpose is debt collection, and it is a debt collector as defined by 15 U.S.C. § 1692a(6) of the FDCPA.

207.    During the course of its efforts to collect debts allegedly owed to third parties, FCF sends to alleged debtors bills, statements, and/or other correspondence via the mail and/or electronic mail and initiates contact with alleged debtors via various means telecommunication, such as the telephone and facsimile.

208.    According to FCF, upon information and belief, Plaintiff incurred an alleged debt for goods and services used for personal purposes, originally for a debt allegedly owed to LendingClub.

209.    The alleged debt is a debt as defined by 15 U.S.C. § 1692a(5) of the FDCPA.

210.    The alleged debt became past due and with a purported balance of $4,912.00.

211.    The alleged debt does not belong to Plaintiff.

212.    FCF knew or should have known that the alleged debt did not belong to Plaintiff.

213.    FCF received notice that Plaintiff challenged the validity and ownership of the alleged debt.

214.    Notwithstanding, FCF continued efforts to collect the alleged debt from Plaintiff.

215.    FCF called Plaintiff's cell phone in an effort to collect the alleged debt.

216.    Plaintiff does not owe FCF any monies as she did not open the underlying account with LendingClub.

217.    As of result of each of the defendant's unique and independent conduct, Plaintiff has suffered unique and distinct actual damages in the form of harm to credit reputation and credit score, out-of-pocket expenses, interference with Plaintiff's normal and usual activities, and emotional distress, including anger, anxiety, frustration, embarrassment and humiliation.

218.    At all times pertinent hereto, the defendants were acting by and through their agents, servants and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of the defendants herein.

219.    At all times pertinent hereto, the conduct of the defendants, as well as that of their agents, servants, and/or employees, was intentional, willful, reckless, and in grossly negligent disregard for federal laws and the rights of the Plaintiff herein.

220.    The defendants' conduct was a direct and proximate cause, as well as a substantial factor, in bringing about the serious and distinct injuries to the Plaintiff that are outlined more fully above and, as a result, the defendants are liable to the Plaintiff for the full amount of statutory, actual and punitive damages, along with the attorney's fees and the costs of litigation, as well as such further relief as may be permitted by law for their violations of federal law.

### COUNT ONE – VIOLATIONS OF THE FAIR CREDIT REPORTING ACT
**(Against Equifax)**

221.    Plaintiff adopts and incorporates the above-numbered paragraphs as if fully stated herein.

222.    Equifax negligently failed to comply with the requirements of the FCRA, including Sections 1681e(b), c-2 and i.

223.    Alternatively, Equifax willfully failed to comply with the requirements of the FCRA, including Sections 1681e(b), c-2 and i.

224.    As a result of Equifax's failure to comply with the requirements of the FCRA, Plaintiff suffered actual damages, described more fully above, for which Plaintiff seeks actual, punitive and statutory damages, in an amount to be determined by the jury.

## COUNT TWO – VIOLATIONS OF THE FAIR CREDIT REPORTING ACT
### (Against Trans Union)

225.    Plaintiff adopts and incorporates the above-numbered paragraphs as if fully stated herein.

226.    Trans Union negligently failed to comply with the requirements of the FCRA, including Sections 1681e(b), c-1 and i.

227.    Alternatively, Trans Union willfully failed to comply with the requirements of the FCRA, including Sections 1681e(b), c-1 and i.

228.    As a result of Trans Union's failure to comply with the requirements of the FCRA, Plaintiff suffered actual damages, described more fully above, for which Plaintiff seeks actual, punitive and statutory damages, in an amount to be determined by the jury.

## COUNT THREE – VIOLATIONS OF THE FAIR CREDIT REPORTING ACT
### (Against PenFed)

229.    Plaintiff adopts and incorporates the above-numbered paragraphs as if fully stated herein.

230.     PenFed negligently failed to comply with the requirements of the FCRA, including Section 1681s-2(b).

231.     Alternatively, PenFed willfully failed to comply with the requirements of the FCRA, including Section 1681s-2(b).

232.     As a result of PenFed's failure to comply with the requirements of the FCRA, Plaintiff suffered actual damages, described more fully above, for which Plaintiff seeks actual, punitive and statutory damages, in an amount to be determined by the jury.

### COUNT FOUR – VIOLATIONS OF THE FAIR CREDIT REPORTING ACT
### (Against LendingClub)

233.     Plaintiff adopts and incorporates the above-numbered paragraphs as if fully stated herein.

234.      LendingClub negligently failed to comply with the requirements of Section 1681s-2(b).

235.     Alternatively, LendingClub willfully failed to comply with the requirements of Section 1681s-2(b).

236.     As a result of LendingClub's failure to comply with the requirements of the FCRA, Plaintiff suffered actual damages, described more fully above, for which Plaintiff seeks actual, punitive and statutory damages, in an amount to be determined by the jury.

### COUNT FIVE – VIOLATIONS OF THE FAIR CREDIT REPORTING ACT
### (Against Regions)

237.     Plaintiff adopts and incorporates the above-numbered paragraphs as if fully stated herein.

238.     Regions negligently failed to comply with the requirements of Section 1681s-2(b).

239.   Alternatively, Regions willfully failed to comply with the requirements of Section 1681s-2(b).

240.   As a result of Region's failure to comply with the requirements of the FCRA, Plaintiff suffered actual damages, described more fully above, for which Plaintiff seeks actual, punitive and statutory damages, in an amount to be determined by the jury.

**COUNT SIX – VIOLATIONS OF THE TELEPHONE CONSUMER PROTECTION ACT**
**(Against PenFed)**

241.   Plaintiff adopts and incorporates the above-numbered paragraphs as if fully stated herein.

242.   PenFed violated the TCPA.  PenFed's violations include, but are not limited to the following:

   a.   Within four years prior to the filing of this action, on multiple occasions, PenFed violated TCPA 47 U.S.C. § 227 (b)(1)(A)(iii) which states in pertinent part, "It shall be unlawful for any person within the United States . . . to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice — to any telephone number assigned to a . . . cellular telephone service . . . or any service for which the called party is charged for the call.

   b.   Within four years prior to the filing of this action, on multiple occasions, PenFed willfully and/or knowingly contacted Plaintiff at Plaintiff's cellular telephone using an artificial prerecorded voice or an automatic telephone dialing system and as such, PenFed knowingly and/or willfully violated the TCPA.

243.    As a result of PenFed's violations of 47 U.S.C. § 227, Plaintiff is entitled to an award of five hundred dollars ($500.00) in statutory damages, for each and every violation, pursuant to 47 U.S.C. § 227(b)(3)(B).

244.    If the Court finds that PenFed knowingly and/or willfully violated the TCPA, Plaintiff is entitled to an award of one thousand five hundred dollars ($1,500.00), for each and every violation pursuant to 47 U.S.C. § 227(b)(3)(B) and 47 U.S.C. § 227(b)(3)(C).

**COUNT SEVEN – VIOLATIONS OF THE TELEPHONE CONSUMER PROTECTION ACT**
**(Against LendingClub)**

245.    Plaintiff adopts and incorporates the above-numbered paragraphs as if fully stated herein.

246.    LendingClub violated the TCPA.  LendingClub's violations include, but are not limited to the following:

a.   Within four years prior to the filing of this action, on multiple occasions, LendingClub violated TCPA 47 U.S.C. § 227 (b)(1)(A)(iii) which states in pertinent part, "It shall be unlawful for any person within the United States . . . to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice — to any telephone number assigned to a . . . cellular telephone service . . . or any service for which the called party is charged for the call.

b.   Within four years prior to the filing of this action, on multiple occasions, LendingClub willfully and/or knowingly contacted Plaintiff at Plaintiff's cellular telephone using an artificial prerecorded voice or an automatic

telephone dialing system and as such, LendingClub knowingly and/or willfully violated the TCPA.

247.    As a result of LendingClub's violations of 47 U.S.C. § 227, Plaintiff is entitled to an award of five hundred dollars ($500.00) in statutory damages, for each and every violation, pursuant to 47 U.S.C. § 227(b)(3)(B).

248.    If the Court finds that LendingClub knowingly and/or willfully violated the TCPA, Plaintiff is entitled to an award of one thousand five hundred dollars ($1,500.00), for each and every violation pursuant to 47 U.S.C. § 227(b)(3)(B) and 47 U.S.C. § 227(b)(3)(C).

### COUNT EIGHT – VIOLATIONS OF THE TELEPHONE CONSUMER PROTECTION ACT
### (Against Alpha)

249.    Plaintiff adopts and incorporates the above-numbered paragraphs as if fully stated herein.

250.    Alpha violated the TCPA.  Alpha's violations include, but are not limited to the following:

a.    Within four years prior to the filing of this action, on multiple occasions, Alpha violated TCPA 47 U.S.C. § 227 (b)(1)(A)(iii) which states in pertinent part, "It shall be unlawful for any person within the United States . . . to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice — to any telephone number assigned to a . . . cellular telephone service . . . or any service for which the called party is charged for the call.

b.  Within four years prior to the filing of this action, on multiple occasions, Alpha willfully and/or knowingly contacted Plaintiff at Plaintiff's cellular telephone using an artificial prerecorded voice or an automatic telephone dialing system and as such, Alpha knowingly and/or willfully violated the TCPA.

251.   As a result of Alpha's violations of 47 U.S.C. § 227, Plaintiff is entitled to an award of five hundred dollars ($500.00) in statutory damages, for each and every violation, pursuant to 47 U.S.C. § 227(b)(3)(B).

252.   If the Court finds that Alpha knowingly and/or willfully violated the TCPA, Plaintiff is entitled to an award of one thousand five hundred dollars ($1,500.00), for each and every violation pursuant to 47 U.S.C. § 227(b)(3)(B) and 47 U.S.C. § 227(b)(3)(C).

### COUNT NINE – VIOLATIONS OF THE TELEPHONE CONSUMER PROTECTION ACT
### (Against FCF)

253.   Plaintiff adopts and incorporates the above-numbered paragraphs as if fully stated herein.

254.   FCF violated the TCPA.  FCF's violations include, but are not limited to the following:

a.  Within four years prior to the filing of this action, on multiple occasions, FCF violated TCPA 47 U.S.C. § 227 (b)(1)(A)(iii) which states in pertinent part, "It shall be unlawful for any person within the United States . . . to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice — to any telephone number assigned to a . . .

cellular telephone service . . . or any service for which the called party is charged for the call.

    b.   Within four years prior to the filing of this action, on multiple occasions, FCF willfully and/or knowingly contacted Plaintiff at Plaintiff's cellular telephone using an artificial prerecorded voice or an automatic telephone dialing system and as such, FCF knowingly and/or willfully violated the TCPA.

255.    As a result of FCF's violations of 47 U.S.C. § 227, Plaintiff is entitled to an award of five hundred dollars ($500.00) in statutory damages, for each and every violation, pursuant to 47 U.S.C. § 227(b)(3)(B).

256.    If the Court finds that FCF knowingly and/or willfully violated the TCPA, Plaintiff is entitled to an award of one thousand five hundred dollars ($1,500.00), for each and every violation pursuant to 47 U.S.C. § 227(b)(3)(B) and 47 U.S.C. § 227(b)(3)(C).

**COUNT TEN – VIOLATIONS OF THE FAIR DEBT COLLECTION PRACTICES ACT**
**(Against FCF)**

257.    Plaintiff adopts and incorporates the above-numbered paragraphs as if fully stated herein.

258.    FCF Defendant is a "debt collector" as defined by 15 U.S.C. § 1692a(6) of the FDCPA.

259.    Plaintiff is a "consumer" as defined by 15 U.S.C. § 1692a(3) of the FDCPA.

260.    Any alleged debts at issue arose out of a transaction which was primarily for personal, family or household purposes.

261.    FCF violated the FDCPA, including Sections 1692e(2)(A), 1692e(8), 1692e(10) and 1692f, as evidenced by the following conduct:

    a.   The false representation of the amount, character or legal status of a debt;

34

b. Communicating or threatening to communicate to any person credit information which is known, or which should be known to be false; and,

c. Otherwise using false, deceptive, misleading and unfair or unconscionable means to collect or attempt to collect a debt from the Plaintiff.

262.   FCF's acts as described above were done with intentional, willful, reckless, wanton and negligent disregard for Plaintiff's rights under the law and with the purpose of coercing Plaintiff to pay monies relating to the alleged debt.

263.   As a result of the above violations of the FDCPA, FCF is liable to Plaintiff in the sum of Plaintiff's statutory damages, actual damages and attorneys' fees and costs.

## COUNT ELEVEN – VIOLATIONS OF THE FAIR DEBT COLLECTION PRACTICES ACT
### (Against Alpha)

264.   Plaintiff adopts and incorporates the above-numbered paragraphs as if fully stated herein.

265.   FCF Defendant is a "debt collector" as defined by 15 U.S.C. § 1692a(6) of the FDCPA.

266.   Plaintiff is a "consumer" as defined by 15 U.S.C. § 1692a(3) of the FDCPA.

267.   Any alleged debts at issue arose out of a transaction which was primarily for personal, family or household purposes.

268.   FCF violated the FDCPA, including Sections 1692e(2)(A), 1692e(8), 1692e(10) and 1692f, as evidenced by the following conduct:

a. The false representation of the amount, character or legal status of a debt;

b. Communicating or threatening to communicate to any person credit information which is known, or which should be known to be false; and,

35

      c.   Otherwise using false, deceptive, misleading and unfair or unconscionable means to collect or attempt to collect a debt from the Plaintiff.

269.    FCF's acts as described above were done with intentional, willful, reckless, wanton and negligent disregard for Plaintiff's rights under the law and with the purpose of coercing Plaintiff to pay monies relating to the alleged debt.

270.    As a result of the above violations of the FDCPA, FCF is liable to Plaintiff in the sum of Plaintiff's statutory damages, actual damages and attorneys' fees and costs.

## JURY DEMAND

271.    Plaintiff requests a jury trial on all claims.

## PRAYER

Wherefore, Plaintiff prays for judgment against the defendants as follows:

On the First Claim for Relief:

1. Actual damages to be determined by the jury;

2. Punitive damages to be determined by the jury;

3. Statutory damages to be determined by the jury; and

4. Attorneys' fees and costs.

On the Second Claim for Relief:

1. Actual damages to be determined by the jury;

2. Punitive damages to be determined by the jury;

3. Statutory damages to be determined by the jury; and

4. Attorneys' fees and costs.

On the Third Claim for Relief:

1. Actual damages to be determined by the jury;

2. Punitive damages to be determined by the jury;

3. Statutory damages to be determined by the jury; and

4. Attorneys' fees and costs.

On the Fourth Claim for Relief:

1. Actual damages to be determined by the jury;

2. Punitive damages to be determined by the jury;

3. Statutory damages to be determined by the jury; and

4. Attorneys' fees and costs.

On the Fifth Claim for Relief:

1. Actual damages to be determined by the jury;

2. Punitive damages to be determined by the jury;

3. Statutory damages to be determined by the jury; and

4. Attorneys' fees and costs.

On the Sixth Claim for Relief:

1. Statutory damages to be determined by the jury; and

2. Costs.

On the Seventh Claim for Relief:

1. Statutory damages to be determined by the jury; and

2. Costs.

On the Eighth Claim for Relief:

1. Statutory damages to be determined by the jury; and

2. Costs.

On the Ninth Claim for Relief:

1.   Statutory damages to be determined by the jury; and

2.   Costs.

On the Tenth Claim for Relief:

1.   Actual damages to be determined by the jury;

2.   Statutory damages to be determined by the jury; and

3.   Attorneys' fees and costs.

On the Eleventh Claim for Relief:

1.   Actual damages to be determined by the jury;

2.   Statutory damages to be determined by the jury; and

3.   Attorneys' fees and costs.

Respectfully submitted,

*/s/ Micah S. Adkins*
Micah S. Adkins
(S.D. Ala. Bar No. adkim8639)
**THE ADKINS FIRM, P.C.**
1025 Westhaven Blvd., Suite 220
Franklin, Tennessee 37064
T:   (615) 370.9659
F:   (205) 208.9632
E:   MicahAdkins@ItsYourCreditReport.com
*COUNSEL FOR PLAINTIFF KAYO CLEVELAND*